Good morning. My name is Eric Seitz. I represent the defendant in this case and the appellant, whose name is Nelson Gaitan-Ayala. To me, it is inconceivable in this day and age that government agents can withhold evidence that would enable a defendant to impeach a key witness and nevertheless assert Why don't you just talk to us without reading? Well, I'm paraphrasing. What I want to do is get to this language about claiming that the defendant received a fair trial worthy of confidence. We don't believe that the outcome in this case is worthy of confidence. The government argues that they had lots of other witnesses and that's true. We conceived them. But all of those witnesses were impeached. All of them were drug addicts and sellers who had made deals with the government themselves. They were internally inconsistent and therefore, individually and collectively, there were serious questions whether any of them or all of them were worthy of belief by a jury. But the one key witness who tied this all together, who the jury probably had a good reason to believe, was Corey Kawili, who is affectionately referred to as Bozo. Bozo was the star witness. He was the guy who said that I have repented. I'm here to do a social service here. I'm not selling drugs anymore. I've made my deal with the government and I am here to see that justice is done. And not only did he say that on the witness stand, but government agents who were familiar with him got up and said, yes, he's been truthful. He's been responsible. In the period of time that he's been working with us, he has been utterly credible. And at the same time, they were holding back statements which indicated that contrary to his agreements with the government, Bozo was still selling drugs, still receiving drugs. And they had those statements for a period of time and they didn't disclose them until after the trial. What's the chronology? When did they first get proof of this or evidence that he was still dealing? The chronology is as follows. First of all, my client was alleged to have been involved in this conspiracy between March of 2005 and June of 2007. Although his first acts actually are alleged to have occurred in 2006. My client was arrested on June 6, 2007 and he went to trial, as the court knows, in October of 2008. After the trial, we received three separate statements from the government which were delivered to us on December 19, 2008, February 2, 2009, and March 17, 2009. And those detail evidence that Bozo was involved in offenses in 2007 and 2008. And the statements were taken well before we went to trial. So the government knew when we went to trial. Indeed, there was a DEA agent sitting with Mr. Cushman. And I don't contend, by the way, I want to make it very clear. I don't contend she knew. The U.S. Attorney's Office was deceived. Well, I believe that. I don't have any reason to believe Ms. Cushman had any role or anyone in her office had any role in holding back those statements. But the DEA agent who was seated at the table throughout the trial with her, and indeed one of the agents who testified at trial, was one of the persons who took one of those statements which indicated that, in fact, Corey Carillo was still selling drugs when he was cooperating with the government, and that, therefore, when the government cut up and vouched for his credibility and responsibility, that those witnesses had within their files evidence that that was not true. Now, all this is uncontested. Judge Stigleit found in our favor with respect to the fact these statements were exculpatory in the sense that they certainly would have helped us impeach Mr. Carillo, Judge Seabright found the government should have turned them over in a timely fashion, and he took an action. He dismissed several counts. But he left two counts, and that's the major problem that we have. First of all, the conspiracy count in which the counts that he dismissed are duplicated as acts by my client. We don't believe that's in any way consistent, because the jury could have found my client guilty of those substantive sales and phone calls, and then gone to the conspiracy, and in light of what they'd already determined with regard to those other counts, found him guilty of the conspiracy. We have no way of knowing in what order the jury found or made his findings when they convicted him of the conspiracy, but because the counts that Judge Seabright dismissed were also alleged as substantive acts. Those other counts, when they were, you went to, there was a second trial, right? Only one trial. Only one trial. Yes. And those other counts, what was it, the conspiracy count? Conspiracy count was count one. Count one, and there was, I've got it written down here. There were a couple of substantive sale counts, and there were a couple of phone call counts, in which my client was implicated. Judge Seabright allowed the convictions to stand as to the conspiracy, and as to the last sale count, which we believe was improper. As to the conspiracy, as I said, the main problem was that Tarini's testimony was critical for the conspiracy count, and there's no way we can determine that the judge didn't rely heavily on his evidence. And secondly, as I said earlier, as to the counts Judge Seabright did dismiss, or set aside and wrote a retrial on, which did not occur, as to those counts, those were also substantive acts alleged to have been part of the conspiracy, and there was no way to determine whether the jury didn't rely upon the convictions of those counts, which were later set aside in order to find my client guilty of the conspiracy. In addition to what the jury must have found to convict on count seven, which was the substantive count, what else would have to have been concluded by the jury to convict on count one? Well, first of all, there was a period of the conspiracy where we had to find that my client was actively involved in this conspiracy during some period in that time, that he was actively involved with others of the co-conspirators who were alleged to have been robbed, to the scope and to the extent which was alleged in the conspiracy, which was very broad. And that's another problem in this case, which is somewhat unique to this case, which we've pointed out repeatedly, and that was that none of the co-conspirators ever implicated my client. And in fact, that's in the record as evidence. We asked the agents on the witness stand if any of the other co-conspirators ever implicated Nelson Gaitanayawa, and they all said no. And this is also a case in which, again, there was evidence in the trial record of extensive wiretaps that were conducted over a period of several months. None of those wiretaps was ever offered into evidence or ever produced any evidence of my client's involvement in a conspiracy. So there was very little, other than what you have in the record, indicating from a number of witnesses that they had dealings with my client at various times, all of which we think were seriously impeached. And then you have Corey Kali tying this all together. Now, with respect to the one substantive count on which my client was convicted, again, we don't understand Judge Seabright's reluctance to set that conviction aside either, because Corey Kali was involved in telephone calls and testified about those telephone calls that allegedly set up that sale as well. So you cannot just simply remove Corey Kali from that last count either, because he was involved in telephone calls, which he then interpreted for the court, for the jury, which then led to the conviction on that count as well. So, now, we've also argued in our briefs, the government has argued with us about what the standards are that ought to be applied here. But let me ask you, of the two remaining counts, of the two remaining counts, evidence came from others who, for want of a better term, were snitches. Is that right? Yes. And, well, Count 7 has more than that. I mean, Count 7 did not involve the sale to an officer? It did. He did testify. Yes. And it was recorded. No question the sale took place. The question was whether my client was in any way implicated or responsible,  And his role in arranging the sale was only testified to by Corey Kalili. Here's what I'm thinking, that here you have Corey Kalili. He wasn't impeached. He's the guy that said, you know, I've seen the light. I've confessed. I want to give back to my community. I want to prevent all these other young people. And I think he said, you know, he was a major source. And I want to prevent all these other young people from ever getting involved in drugs. He said something like that, didn't he? Yes. And so here he was. He was a big liar. He was out dealing in drugs while he was working as an informant, right? Presumably, yes. Presumably, yeah. And then the rest of the case is based on others who had been involved in drugs. Yes. And you never know what's going to go through a jury's mind. And if you add all this material and you have this Kalili, and he's badly impeached and shown to be a total fraud and a liar, that could have had an effect on how the jury would have judged the credibility of all these other witnesses. That's exactly our argument. Yeah. Yes. That's your argument. I thought it was mine. Then we agree. Well, you know, my experience as a trial judge for 15 years is that you never really knew what a person could have hung up. That could have happened too. If you had all this come out, I mean, it's just, it's just, here you have all of these law enforcement people, some sitting at the council table. I've had that happen, actually, in a big drug case where the head of the team was an LAPD officer, and he knew the witnesses were lying when they got on the stand. And so this, that case didn't turn out too well for the government at that time either. But you never know how it's all going to come out. In this count seven, did it turn on Kay O'Wheelie's identification of your client as being involved in that sale? Yes. He would not otherwise be tied into it? That's correct. Now, they have evidence, again, of my client being called by Kay O'Wheelie, and then the transaction following in some sort of fashion suggesting that it was my client as a result of that call that led to the transaction. However, again, what we later learned was that Kay O'Wheelie was also in that period of time receiving drugs from other sources. And the mere fact that he apparently was still dealing and was receiving drugs from other sources would have been extremely effective to cross-examine him when he said that basically this deal that took place in March of 2007 was arranged with our client, who was affectionately referred to as Uncle. We could have argued, had we known, that it could have been any number of people that Kay O'Wheelie actually made that contact with, but we were foreclosed from making that argument. So my client wasn't there for the last transaction. The only contact with that was the one phone call that led up to the transaction, and that was not set aside. And again, we believe, for any number of reasons that I've already alluded to, that we cannot be convinced that the jury reached its verdicts on those additional counts which were preserved, or that they would have reached those verdicts, but for the fact that we did not have the evidence that we now have. We've argued that there are different standards to be followed in this case from the top or from the proposition that we would start. It is clear that when you have discovery issues of an exculpatory or gravy nature, that there are high burdens on the government which result in a very careful analysis by appellate courts, on down to the actual standards used by the court here with respect to a reasonable probability from U.S. v. Jernigan. Even if you use that standard, which we believe is not the correct standard here, we believe that the outcome should be that our client should receive a new trial as to all of those counts and that the conviction should be set aside. I'm not going to argue the other matters in the brief. I think that they're adequately – I don't want to abandon them. I think they're adequately raised, but this is the issue I wanted to raise, and I'd prefer now to prefer to use the rest of my time to rebuttal if necessary, unless there are other questions. Good morning. May it please the court. My name is Susan Cushman for the United States, and I was trial counsel in this case. And I want to be the first to tell you that I wish I wasn't here before the court on this particular issue. And I want to say, could the government have done better? Yes. Should the government have done better? Absolutely. That being said, though, I disclosed this information as soon as I became aware of it. And to follow up on Judge Fletcher's question, technically the government was in possession of this information in January of 2008. That's when Mitch Jones generated the DEA report that was – he had the interview with Holokai Mataliona and, you know, identified Corey Calwillie as having dealt drugs with him. But as soon as I found out this information personally, I then traveled to Victorville to interview Holokai Mataliona, and consistent with my obligations under Price, which was decided by this court, I investigated further and I found out that there was additional evidence of drug dealing involving Corey Calwillie and Holokai Mataliona, which I disclosed to Mr. Sykes. Now, my case agent, Bill Wise, from the DEA, who sat with me at counsel table, there's nothing in the record to indicate that he personally had knowledge of this either, because as the court may recall, when Agent Jones generated the report, he had the case file, the Gaitan Ayala case file, but it was misfiled by the DEA. So when Agent Wise did his Natus check prior to trial, this never came up in the Gaitan Ayala database. I'm not saying that that's an excuse. And again, the government, you know, should have absolutely done better. I'm just in front of the court. Aren't these folks, they work out of the same office? They do. They do. And they go out and have coffee and they have lunch and they talk to each other and they know what cases are coming up and they, you know, they know the names that they know who these people are out there. Am I right? Correct. They're their customers in a sense, you know. They know who they are. If they weren't there, the agents wouldn't have much to do. So they know who they are. So it's hard for me to believe that the – And it's not unusual for information to be withheld from the U.S. Attorney's Office. It goes on. I don't like – We're not blaming your office. I understand. I commend you and your office for digging this up and making it available as soon as it appeared. And so you had to come in, I think, three times to make those disclosures. And we did. And Judge Seabright applied the standard from the Jernigan-Onn-Fonk decision, which was then adopted in Price, and that was, did this trial result in a verdict worthy of confidence? And I think that you can clearly say that it can because count seven is a count involving a sale to an undercover officer. And Mr. Seitz has never disputed the credibility of the undercover officer. So the question is connecting defendant to sale. Yes. Thank you. We need to focus on that. What do you got? Okay. This is what I got. You have Zanetta Nixon, who was an uncharged co-conspirator, not a co-defendant, but an uncharged or separately charged co-conspirator, who went to purchase or pick up a pound of methamphetamine from Hector Cruz the same day that the sale to the undercover took place. And she testified at trial that she saw Hector Cruz with two pounds and that she wanted both pounds, and she asked Hector Cruz for both pounds. And he told her, no, I cannot give that to you. The other pound has to go to Corey Calwillie, which everybody knew was Nelson Gaetano Ayala, wants me to give it to Corey Calwillie. And I can point that out to you in the record. That's in supplemental excerpts of record 74 to 75. 74 to 75. Right. Supplemental excerpts of record. So that. So that's Zanetta Nixon. Supplemental. Yes. Page 74. To 75. So is it okay if I keep talking? Okay. So essentially Corey Calwillie's only involvement in count seven was to introduce the undercover to Hector Cruz so that Hector Cruz could then take over dealing with the undercover. And that happens supplemental excerpts of record 113 and also exhibit 70, which is a phone call. But there's I guess the phone calls that you want to focus on that sort of tie, and they're not necessarily just phone calls, but they're body recordings to tie the defendant to the one pound sale. There's phone calls where, well, first it starts off with a meeting. Let me interrupt you. Okay. What lines? I'm looking at 74. What lines are you referring to? May I just pull out my excerpts of record? They're in my litigation bag. Okay. Thank you. Well, this is a testimony. This is Zanetta Nixon testifying on the stand. And now it says, okay, directing your attention to March 23, 2007. Did you ever pick up a pound of ice from Hector Cruz? I'm sorry, line three on page 74. And she says, yes. And question, how did that come about? Answer, because he had gotten two pounds of ice. So I got one from him, and I don't know. He didn't get the other pound. That's all I know. Question, line 11, do you know who got the other pound? Answer, line 12, yes, I do. Question, who's that? Answer, 14, Bozo. And do you know if Bozo has another name? I know his name is Cory. I wanted both. And then it goes on to say that essentially, if you go through the bottom of the page, that I had already sold one, and I wanted to sell the other so I could make a profit. Why didn't Hector give you the second pound? That's line 24 on page 74, turning to page 75. He didn't give it to me because he said Uncle told him to sell it to Bozo. And then if the court recalls, there are a series of what starts off as a meeting on March 14th involving Hector Cruz and Cory Cowlilly and the undercover officer who's introduced as Cory's cousin. They meet, and they discuss getting the chickens together in the future. So they have that meeting, but they have to postpone it because the chickens aren't ready. And it turns out the undercover officer also testifies that he understands it to be code language, but the methamphetamine isn't ready. And then there are a series of phone calls involving Hector Cruz and Nelson Gaitan Ayala and Cory Cowlilly, sort of where Cory gets clearance to provide the additional methamphetamine to Cory or Cory's cousin. And that's approved. And then ultimately, as the district court pointed out, on March 23rd, the sale is consummated and one pound of methamphetamine is sold to the undercover at the parking lot of Zippy's restaurant. So just to recap, the evidence that you have aside from Cory Cowlilly tying the defendant to the sale is basically Zanetta Nixon, where she goes to get her pound of methamphetamine from Hector Cruz and can't get it. Only can get one pound instead of two because Hector tells her that that other pound is promised to Cory Cowlilly. And we know that that's the sale because on that same day, the sale happened with the undercover officer purchasing one pound from Hector Cruz. Now, tell me again exactly how the defendant is tied into this. He's tied in through Zanetta Nixon's testimony that when she asked Hector Cruz, can I have the second pound that you have? And Hector Cruz says, no, I have to sell that to Cory. Uncle told me to sell it to Cory. And uncle? Is Nelson Gaitan Ayala. And nobody doubts that? Everybody, all the government's witnesses who testified, testified they all knew him as uncle. They would call him uncle. So that's in the record in numerous places. But he's also identified as uncle, yes. But is Nixon, what was her role in this? She was a separately charged co-conspirator who received, she was Hector Cruz's girlfriend. She received methamphetamine from Nelson Gaitan Ayala. But she was getting something out of this, right? Well, she was charged, separately charged. She pled guilty to an information. She received a reduction in sentence in exchange for her testimony here at trial, yes. Was she impeached? Yes, she was. I mean, she was cross-examined on her drug use, on the fact that she had lost custody of her child because of her drug use. She was cross-examined on some inconsistent statements that she had made. So, yes, Mr. Seitz vigorously cross-examined her and did impeach her. And in closing, of course, the jury was told, during instructions, the jury was told not to just believe these witnesses just because they say something, because they'll have criminal records and they're a suspect of belief, but that you should look to other evidence that corroborates what they're saying. And, for example, Zanetta Nixon was corroborated in her dealings with Nelson Gaitan Ayala because she went to Las Vegas three times to meet with him. And she talked about her three meetings with him. He was always identified as the source of her methamphetamine. And we had plane tickets. Who was he then? Uncle. Uncle. Uncle. Yeah. Well, if she's seriously impeached and the jury knew that Corey was a big-time liar, maybe everything is tainted? Well, I don't think so, because you need to perform a contextual analysis, which the court has identified in the Jernigan-On-Bonk decision and which the court also identified in U.S. v. Price. And that's what the court did in this case. They took the withheld evidence, the impeachment evidence that wasn't disclosed, and they weighed it against the evidence that both sides presented during the course of the trial. And after that analysis, the court appropriately, the district court appropriately found that this was a verdict worthy of confidence precisely because of this one sale. It was a sale to an undercover officer. And you didn't even need Corey Cowley's testimony to find the defendant guilty of this sale if you credit the testimony of the other witnesses. But that's the question. And should we credit the testimony of this impeached witness when Corey's testimony kind of cast doubt on the whole trial? Well, the jury saw her testify and was in a position to weigh her credibility, and they were instructed to, you know, be suspect of her testimony. And they determined after listening to her that she was credible. But at that time, they didn't have any proof that any of these witnesses, they were impeached, but they might have all been credible. It wasn't until the Corey story broke that we knew that he was just not credible. Right. But I would have argued that Corey's involvement with Maddalena was a separate thing that had, I mean, there was no evidence that Zanetta Nixon was involved in that in any way, and that was sort of Corey's own deal, if you will, that he had carved out on the side. So I don't... No, but it kind of cast an odor across the whole trial. I think that the district court... You know, you just, you don't know what a jury's going to do. Maybe you do. No, I don't. I mean, something like that, where here's this person who is telling us that he has seen the light, he confesses to his sins, he's doing this to give back to the community, he wants to save a generation of children, he's a really big drug dealer, and all the rest of it. And you find out, and this is a government witness, and you find out the guy's a big liar and a crook and continues to be a drug dealer, and then you have these other witnesses who are coming in and making a deal. It just casts a stink over the whole... Well, to look at it another way, all these other witnesses then, they actually corroborate Corey Calwillie, because all these other witnesses continue to identify Nelson Gaitanayala as uncle. You know, you have... But you know, a trial has got certain dynamics to it. Is that right? Yes. And you never know how the dynamics might be different if here was, whatever his name, Corey, were just impeached and made to show what a liar he is and what a hypocrite and all the rest. You never know what the dynamics would have been all the way through. You just don't know. Turn back to count one and tell us what needed to be established for the conspiracy count. Okay. Well, first, I think that if you find the defendant was involved in count seven, then you find that he's involved in the conspiracy, because obviously count seven is part of the conspiracy. So that's how you tie it together. Well, there's other evidence as well, but that's my lead-in. I guess I want to start off by saying, too, that there's evidence that Nelson Gaitanayala was involved in the conspiracy beginning in the summer of 2005, because that's when Edward Tufele, who was another government witness, went to Las Vegas and began teaching the Gaitanayala family, if you will, how to can methamphetamine, how to seal methamphetamine in cans and send it back to Hawaii. And so there was testimony from Edward Tufele that he went up there and he met with John Eduardo Ayala and Nelson Gaitanayala, and they discussed getting ready methamphetamine to be shipped back to Hawaii. And in fact, John Eduardo Ayala met him with 16 pounds that he canned. And then it goes on, and we had testimony from Nathan Oandesan, who was directly asked by Nelson Gaitanayala to help him distribute drugs. And so Nathan Oandesan's role on Oahu was he would receive the methamphetamine in cans and he would open the cans and take the methamphetamine around to the different people who were distributing it. In turn, he would collect money. And bring that money back to Nelson Gaitanayala. And that was corroborated through plane tickets of Nathan Oandesan traveling to Las Vegas. It was corroborated with a plane ticket where Nelson Gaitanayala actually came here and met with Nathan Oandesan and collected money from him. And there's a plane ticket that's supplemental excerpts of record 194 to 195, where the defendant flies down here for less than 24 hours, turns around and goes right back to Las Vegas. I'm on my car travel schedule sometimes. Right. Then it's also corroborated by Regina Costales, who was another person who flew up to Las Vegas with money for Nelson Gaitanayala. And again, her testimony was corroborated by plane tickets and hotel reservations. She said she, in fact, met with Nelson and would give him money and he would take money out of the money that she had given to him to pay her. And all this was going on between 2005 and 2007 when we ended the investigation. But that's how I would tie him into count one, through those other witnesses. There are lots of pieces of evidence, and I may not have them straight, but it seemed to me that a piece that the district court relied heavily upon in connecting defendant more directly was the taped conversation between Corey and defendant a few days before the March 23 transaction. Correct. And I guess it's sort of noticeable to me that you didn't say anything about that before. So I'm curious, is there a reason you're not pointing at that, or how do you think that fits into this? No, I just have a lot of stuff going on in my head. I mean, I sort of referenced it, and there's a series of conversations that start with Exhibit 69 and goes through 71, which kind of talks about the evolution of how Corey introduces the undercover as his cousin, and he speaks to Hector Cruz about it, and then Hector Cruz says he needs to get approval from Nelson Gaitan Ayala before he can actually sell the methamphetamine. So that's part of it. The taped conversation I was looking at differently, because it's the piece that doesn't require somebody else who's in some fashion been impeached, because everybody here's been impeached in some way. Right. This is the only place that I found in connection with Count 7 where the defendant himself is speaking, and where the connection doesn't depend upon the say-so of somebody else. Yes, that's correct, it doesn't. And I guess I would point out that the defense at trial was that Nelson Gaitan Ayala was actually talking about fighting chickens, and that he wasn't really talking about a methamphetamine deal. Oh, that's what I'm about to get to. The conversation is turned about chickens. Now, how do we know that chicken stands for crystal meth? Well, okay, aside from Corey Calvillo's testimony, you also have the testimony of an undercover officer, Kian Tabanera, who testified that when he engaged in those conversations they always used the word chickens, and he explained why they used the word chicken, that people who are selling drugs don't usually use the term methamphetamine. And getting Corey out of the mix, you still have the undercover officer. Right, correct. And the undercover officer, even when he met with them on March 14th, and there's a body recording from that, they're talking about chickens, and having the chickens ready for the fight. I'm supposed to stop now. Well, keep going. Finish the answer. I can talk a lot. Don't talk that much. That's all right. But finish the answer. Now, I think this is critical. The conversation, the one conversation that I can find that links the defendant directly. Yes. To take conversation, talks in terms of chickens. Right. So we've got to be able to translate chickens. The jury has to be able to translate chickens, not just be able to, but it has to be so compelling that it's not realistic. You can translate chickens to methamphetamine because it starts really on March 14th, where the undercover officer meets with Hector Cruz and they talk about chickens. And then you have the phone calls, and it's always a talk about chickens. And we're going to fight the chickens tomorrow. We can't fight the chickens. And ultimately what turns up in the parking lot of the Zippy's in Wahiawa is not a chicken fight, but it's a methamphetamine deal. And those conversations are contemporaneous with the drug, or essentially contemporaneous with the drug transaction. And that's how you know that they are talking about methamphetamine and not fighting chickens. Thank you. Thank you. Thank you. I want to just talk briefly about uncle and chickens. We're going to hear about chickens, no question. Okay. Well, let me start with uncle because that's who he is. Because there were other uncles referenced in the testimony. And, in fact, my client was the uncle of Hector Cruz. He was the uncle of John Ayala. And his brother, who was another uncle, is another named co-conspirator. But, again, none of those people, including Hector Cruz and John Ayala who testified, ever implicated this uncle, my client, in any of the offenses which they themselves admitted to. As to chickens, there's a lot of testimony about chickens. My client, who comes from El Salvador, has a long history of raising and participating in chicken fights and winning trophies. We showed the jury pictures of the trophies, and witnesses testified that Cory Carilli and my client were involved in chicken fighting together. Indeed, when he came out here for a couple of days, he and Cory went to a chicken fight and were talking about selling chickens. And that is clear in many of the conversations. So chickens was a legitimate subject of conversation. The only person who purports to make a connection between chickens and drugs is Cory Carilli. He's the one who interprets that. And so Cory's testimony is critical at every stage. He interprets these phone conversations. He initiates some of the phone conversations. If you, again, go back to the wiretap testimony that occurred over several months, which was never offered into evidence, but the agents testified about it on cross-examination, there was nothing, during any of that wiretap conversation, which implicated my client in any drug transactions. But, yes, my client was deeply implicated in chickens. And, therefore, for a jury to have found, as they did, as to these two remaining counts, I do not believe that you can entirely remove Cory Carilli's influence from those findings. Cory was all over the map in this case. And the jury undoubtedly was impressed by him and also was impressed by the government vouching for him, which took place. And, therefore, I believe that this verdict, or the two verdicts, which were allowed to remain, are not worthy of confidence and new trials should be ordered. And, again, I want to thank you for your patience. Well, thank you very much. And with that, let's see, it's Friday, isn't it? Yes. Okay. We're leaving. And it's been a pleasure. Not all of us, please. Well, we'll take you with us. It's been a pleasure to serve again in Moapa. Thank you. Your Honor, my case is on the counters and not cruising. Oh, Mr. Cruz, do you have, did you appeal? Well, if I may, yes. My name is Richard Buffondi. I am CJA counsel. I was representing Mr. Cruz down below. And what I did was I filed an Anders brief, a motion to withdraw. But I saw the case on the calendar, so I've been here all morning, waiting for my turn to ask you to allow me to withdraw from the case, if you haven't already granted my motion. We have the motion. We didn't anticipate you were going to arrive, and I've never heard an Anders brief actually argued. So that's probably why we didn't anticipate it. It's our understanding there was no filing by Mr. Cruz in response to your motion, because it's the same case for our purposes. They're consolidated. So I don't know if there's anything more that you need to say. Okay, I'm done then. Thank you very much. You're welcome. Yeah, just on your resume, look down at this appearance. And your one opposition was speechless. Thank you. The board for this session stands adjourned. We've got to wind up. All right. Good job, Eric. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Fletcher B. , Pregerson, Clifton